# LOS ANGELES & SALT LAKE RAILROAD COMPANY ET AL. *v.* LYTLE

No. 3097

August 5, 1935.                    47 P. (2d) 934.

*Leo A. McNamee, Frank McNamee, Jr., Malcolm Davis,* and *E. E. Bennett,* for Appellants:

*Chas. Lee Horsey,* for Respondent:

# OPINION

By the Court, DUCKER, C. J.:

Plaintiff brought this action as administrator of the estate of his deceased wife to recover damages for her death alleged to have been caused by the negligence of the defendants. The court, sitting without a jury, rendered judgment in his favor for the sum of $12,500. The defendants moved for a new trial, which was denied. This appeal is taken from the order of the court refusing a new trial and from the judgment.

In the early morning of February 12, 1932, in Clark County, John M. Lytle, Jr., the son of the plaintiff, accompanied by his mother, Vilate Lytle, was traveling in an automobile northerly along Federal aid highway No. 91, a state highway commonly known as the Arrowhead Trail. He was driving. They had come from Los Angeles during the night and were on their way to Overton, the home of the parents. When they reached a point on the highway where it crosses the St. Thomas branch railroad of the defendant railroad company, the automobile ran into a gondola car which was standing on the branch line across the highway and Mrs. Lytle was fatally injured. The gondola car was a part of a train which the defendants were running westerly from St. Thomas to Moapa. Shortly before the automobile reached the intersection the train had arrived there and the crew was engaged in switching an empty car from a spur track just west of the crossing onto the branch line to attach it to the train. The switching operation could not have been accomplished if the train had pulled to the west so as to clear the crossing because the distance from there to where the spur joined the branch line was not great enough to accommodate all the cars of the

train. If the train had stopped clear of the highway east of the crossing, then in order to accomplish the transfer of the empty car to the train two additional trips over the crossing would have been necessary, one forward by the engine and tender, and one back by the engine tender and empty car.

It was still dark when John Lytle, Jr., and his mother met with the accident. The highway on either side of the crossing was oiled and dark in color. The gondola car was painted black. By reason of the fact that the approach to the crossing from the south was located in a cut with high embankments and hills on each side extending to within a few feet of the railroad, the crossing was a hazardous one under any conditions. From a point several hundred feet to the south of the railroad to the crossing the highway was on a descending grade. There were no lights there and no flagman or employee of the railroad company to warn travelers on the highway that the crossing was blocked. There were two railroad warning signs along the highway to notify travelers of the crossing, one being an upright cross-arm sign about 20 feet south of the crossing, and one an upright post with a round sign on top of the post with bullseye reflectors marked "R. R.," located about 600 feet south of the crossing. It is a matter of common knowledge that the highway is a transcontinental highway and is used quite extensively both day and night. The regular schedule on the branch line was one train each way per day.

From about 1,200 feet south of the crossing to it, the highway was straight. John M. Lytle, Jr., testified in plaintiff's behalf, in substance, as follows: He was 23 years of age in February, 1932. He used a 1929 Ford roadster on the trip. He knew how to drive and had driven a car a number of years before January 21, 1932. He drove a truck prior to that time quite a while. His business was driving trucks. The return trip to Overton from Los Angeles was started on the evening of February 11, 1932. On the night of February 10 he retired about 11 o'clock and had about 8 ·or

9 hours of sleep that night. He was never accustomed to getting any more sleep before he went on other trips. The automobile was in good condition and ran fine. It was equipped with good lights — standard equipment Ford headlights. The lights were sufficient to reveal an object 75 feet ahead of the lamps under normal conditions. The brakes were in good condition. They had been tried out before leaving town. He did not get off the road at any place and did not go to sleep. He was talking to his mother about a half or three-quarters of a mile from the crossing—told her they were almost home, or something to that effect. While he was driving down towards the crossing he was looking straight ahead watching the road. He had slowed down on the curve and as he approached the railroad he lessened his speed. The night was very dark and the highway was a black oiled road. He did not look for any train to be there because he did not see any lights to show that there was anything in the road. He was almost on the car before he saw it—about 20 feet away, or something like that. His best judgment was that he was traveling about 25 miles an hour at the time, and not more than 30. He tried to stop when he saw the gondola car across the road but could not. When he regained consciousness after the crash he was in the Las Vegas hospital. The driver of the automobile was the only eyewitness to the accident, the mother having died shortly after the crash. None of the train crew saw it, but the conductor of the train heard the sound of the automobile striking the car.

John Williamson, a witness in behalf of plaintiff, testified in part as follows: He was present soon after the accident occurred at the intersection of the Arrowhead Trail and St. Thomas branch of the Los Angeles & Salt Lake Railroad. The black gondola car was across the highway. There were cars between the black gondola car and the caboose, possibly two. There is considerable elevation there, and it is a rough country. There are hills and rocks which obstructed the view as

to other cars and caboose. It was very dark that morning. He had to have a flashlight to work down there. The road had been oiled, and was dark in color, and the gondola car was dark in color. The hills on each side come pretty close to the road there. There is quite a cut there for several hundred feet approaching the railroad. The hills are not so dark in color. The road and the car naturally look dark at night. The hills are gray and brown, and they extend pretty well up on each side. On the one side they are about 15 feet, and possibly 10 or 12 feet on the other. There is more of a cut as you go down towards the railroad, and that cut runs about 400 feet.

Mr. Hitchcock, a witness for plaintiff, who lived near the scene of the accident, testified as to the environment. It was very dark that morning. He had to have a flashlight to walk down there. The road had been oiled and was dark in color, and the gondola car was dark in color. The hills on each side come very close. The road and car naturally looked dark at night. The hills are gray and brown and they extend pretty well up on each side. On the one side they are about 15 feet, and possibly 10 or 12 feet on the other. There is more of a cut as you go down towards the railroad, and the cut there runs down about 400 feet.

Albert Laub, a witness for plaintiff, who arrived at the scene, testified in part: It had been raining and the sky was very cloudy. When he got down there, there was a part of the train across the track—one car, and one car on each side of it. There is a deep cut there. The car that was across the highway was painted black. The highway was oiled, and it was really darker than a natural oiled road on account of being wet. It absorbed the light. The crossing is extremely dangerous.

Lamond Laub, a witness for plaintiff, testified in part as follows: He was there about 4: 30. The road was wet. It was an oiled road and dark in color. It was very dark.

There was evidence that it had not been raining and that the highway there was wet with gasoline which had escaped from the wrecked automobile.

On this evidence and other evidence introduced by defendants, which we will mention later, the trial court made a number of findings, which included findings that the time consumed in switching was not more than five minutes; that during this time defendants had left a black gondola car attached to other cars directly across the intersection of the highway with the railroad; that the highway was oiled on both sides of the intersection and was of a black color; that the highway west of the intersection was constructed in a cut, which left high embankments on each side of the highway and which extended to within a few feet of the railroad crossing; that there were two railroad crossing signs along the highway, one being an upright crossarm sign about 20 feet south of the crossing, and the other an upright post with a round sign on top of the post with bullseye reflectors marked "R. R." located 600 feet south of the crossing; that there were no lights at the crossing and no flagman or employee of the railroad company to warn travelers on the highway of the existence of the gondola car at the crossing; that said crossing was an extrahazardous one when approached on said highway from a southerly direction, on account of the cut and the high embankments on each side thereof, and its hazardous condition was enhanced by leaving such black gondola car across said highway without lights; that it is a matter of common knowledge that the highway in question is a transcontinental highway, and is used very extensively, both day and night; that the railroad, being a branch line, was not used as extensively as the highway; that defendants must necessarily be charged with knowledge of the existence of the highway, and that many travelers pass over the crossing at night; that John M. Lytle, Jr., would be chargeable with knowledge that trains pass over the crossing, but not that they would be allowed to block the crossing unnecessarily; that there was no necessity to block the

crossing with the gondola car while the switching was being done, as there was plenty of room to leave the unused portion of the train east of, and entirely off the crossing during the switching process, and the danger would have been lessened thereby to a great degree; that John M. Lytle, Jr., was driving at a rate of speed of 25 to 30 miles an hour down through the cut towards the railroad crossing; that the night was dark, the road appeared black, and the gondola car was black; that the lights on the automobile were burning and were good lights; that Lytle, Jr., did not see the gondola car on the crossing until he was within a few feet of the same; that he had applied the brakes on the car, but could not stop in time to avoid running into and under the side of the gondola car, which he did; that as a result of this collision Vilate Lytle was injured to such an extent that she died shortly thereafter, to wit, on the 12th day of February, 1932; that the defendants did not use the measure of care and diligence required of a railroad company under the circumstances, while it appears from the evidence that John M. Lytle, Jr., and his mother, Vilate Lytle, did use reasonable care under all circumstances.

From these findings the trial court concluded that the defendants were negligent in leaving said black gondola car standing across said highway, and that such negligence was the proximate cause of the accident and injury and death of Mrs. Vilate Lytle. The contentions of the defendants are just the reverse. They contend that defendants were not negligent, but if so, the driver of the automobile was guilty of contributory negligence, which was the proximate cause of the injury complained of; and that such contributory negligence is imputable to the deceased and bars recovery.

■ It may be stated as a general principle of law that a railroad company, in the absence of a statute requiring lights or other precautions, may not be chargeable with actionable negligence merely because its train is at rest on a crossing at a public highway, or in motion, and is run into by an auto traveling on

the highway. Certainly it cannot be so chargeable if the accident happens in the daytime, nor in the nighttime on account of darkness alone.

The case infra is one holding that a railroad company is not negligent in the absence of such a statute if the accident happens in the nighttime and there are no other elements of hazard than darkness. St. Louis-S. F. R. Co. v. Guthrie, 216 Ala. 613, 114 So. 215, 56 A. L. R. 1110.

The question of the negligence of the defendants hinges on whether there were such other elements of hazard as to charge the conductor who had charge of the train, with the knowledge that the driver of an automobile whose machine was properly equipped with lights, and who was exercising reasonable care, would likely not see the obstruction on the crossing in time to avoid striking it. We think the circumstances on the night of the accident were sufficient to charge the conductor with such knowledge. He was familiar with the environment which prevailed at the scene of the accident. He knew that the highway was a transcontinental highway and used extensively by travelers in automobiles day and night. He knew, for he so testified, that the crossing was dangerous even in the daytime, that is, he said, to automobiles from approaching trains. He knew that the highway was dark, that the car was black; that the sky was black and the hills were brown; that there were high hills on each side of the crossing and a deep cut through the hills on a descending grade to the crossing which obstructed the vision as to cars or lights on the east or west until one was quite near the crossing. He knew, or ought to have known, that placing the gondola car across the highway under such circumstances would increase the dangerous nature of the crossing. The conductor testified that the car was there for three minutes and that the switching and recoupling and pulling the train over the crossing took a minute. So the crossing was blocked unnecessarily for at least two minutes. The argument that this was safer than to leave the entire train on the

east side, which could have been done, and consumed a minute in going forward with the engine and tender and back with the car from the spur track, and then forward with the entire train, does not appeal to us. The movement and noise of the train, the likelihood of the headlight on the engine, or other lights on the moving train attracting the attention of a driver, and the much lesser time that the crossing would be occupied by the train, or engine and tender, are elements opposed to the idea that the blocking of the crossing for a much longer period of time under the attendant circumstances, was safest for travelers on the highway. The testimony of the other trainmen coincided generally with the conductor, particularly as to his opinion that it was safer to block the highway, as was done, than to leave the train east of the crossing. Testimony as to conflicting statements of some of the witnesses for plaintiff was introduced by the defendants, but the weight of this was determined against them by the trial court.

■ We have not set out all of the evidence, either of the plaintiff or the defendants, but only such as we think is necessary to show the reason of our ruling, that the evidence is sufficient to sustain the findings of the court. The true rule, and which fits the circumstances of this case, is stated in 22 R. C. L. p. 994, and is as follows: "In the absence of statute, the mere fact that a railroad company obstructs a street or highway at a public crossing, by letting a train or cars remain thereon for a reasonable length of time, and for proper purposes, is not negligence, and the company is not responsible for injuries caused thereby. But a railroad company is liable for injuries caused by reason of such obstruction, when it amounts to negligence as where it allows its trains or cars to remain on the crossing unnecessarily, or for an unreasonable length of time, by reason of which injuries are received by one who attempts, with due care, to cross or go around the obstruction."

■ As to the care of a railroad company at a crossing, it is stated in 52 C. J. 210, 211, as follows: "The degree

of care required is only what, under the circumstances of the particular case, is ordinary care; or in other words, such care as an ordinary prudent person would exercise under like circumstances. It varies as peculiar and unusual conditions are presented. Where the crossing is especially dangerous, it is incumbent on the company to use increased care commensurate with the danger, even though the crossing is not a much traveled and used one, and the traveler upon it knows of its extrahazardous condition."

■ In the instant case the court found that the crossing at the time of the accident was extrahazardous. The evidence, in our opinion, is without conflict on this point. It shows an environment and use of the highway at that time which made the crossing unusually dangerous. A duty was therefore cast upon the defendants to exercise care commensurate with the condition existing. Instead of discharging this duty they increased the hazard of the situation. They placed a black car entirely across the highway, which, according to plaintiff's theory (and the evidence will bear such implication) so blended with the darkness, highway, and adjacent embankments as to practically camouflage the crossing. This act was unnecessary. In the daytime the car itself would have been sufficient warning to travelers on the highway that the crossing was blocked, but under the existing condition the placing of it on the crossing and leaving it without taking adequate precautions to warn approaching motorists of the danger, amounted to negligence.

In Prescott v. Hines, 114 S. C. 262, 103 S. E. 543, the action was for personal injury from collision of an automobile with a train standing across the street. There was evidence that the train was blocking one of the most traveled streets in the city of Columbia, and that the cars had no light of any kind upon them, or near them, or any guard or watchman to give warning; that on the night in question there was a fog or smoke that made the place where the cars were standing dark and obscured the same. This evidence was held sufficient

to go to the jury on the question of negligence. True, there was no fog or smoke in the instant case, but the evidence tends to show that a condition prevailed at the crossing of a more dangerous kind. The average automobilist, when he encounters fog or smoke obscuring his way, instinctively acts with caution. Whereas an obstruction in his road under such conditions that the lights of his car cannot reveal it may become a trap despite his vigilance. The extent to which a black surface will absorb the light of an automobile is known to every motorist.

In Chicago & N. W. Ry. Co. v. Prescott (C. C. A.), 59 F. 237, 23 L. R. A. 654, the court held: "The mere grant of a license to lay a railroad track across a public street gives no authority to stand cars thereon, so as to obstruct the crossing, for such periods as may suit the company's convenience; and whether it had a right to do so, in any particular instance, is a question for the jury, if the circumstances are such that reasonable persons might entertain different views as to whether the blockade was justifiable."

██ Was the driver of the auto guilty of contributory negligence? As previously stated, he was the only eyewitness surviving the accident. The substance of his testimony has been heretofore set out. Considering it in the light of the environment presented by the evidence, we think that at least it discloses a case where reasonable men might honestly differ in opinion, and was therefore a question for the trial judge to determine. Bunting v. C. P. R. R. Co., 14 Nev. 351; Orange & N. W. R. Co. v. Harris et al. (Tex. Civ. App.) 57 S. W. (2d) 931. The question of contributory negligence on the part of a motorist is generally for the jury. 4 Berry Automobiles (7th ed.), page 156; Elliott v. Missouri Pac. R. Co., 227 Mo. App. 225, 52 S. W. (2d) 448, 451.

In the case last cited it appeared from the complaint that the street paving was a concrete slab, and on the crossing a train of dark coal cars was permitted by the defendant to remain standing for thirty minutes

or more across the street, completely blocking all traffic on said street, which was extensively used at all hours of the day or night; by all kinds of motor and other vehicles. It was dark, and the weather was misty and foggy. With matters in this condition, the plaintiff's automobile coming along the street violently crashed against the cars of said train standing on the crossing. The court's remarks in passing on the question of contributory negligence are pertinent to the situation in the instant case. The court said: "Nor can such contributory negligence so appear unless we must say that, regardless of the circumstances, the mere driving of the automobile down the street and into a silent, invisible, unexpected, and waiting line of dark coal cars, is negligence as a matter of law. * * * But the atmospheric conditions were not normal. And before it can be said as a legal conclusion that plaintiff was negligent in not seeing the cars, it must be assumed that, under the conditions and circumstances of that particular occasion, the cars could have been seen in time to have stopped. But it is well known to every motorist, of more than mere infantile experience, that with an obstruction of the color here shown, motionless and without noise, blending perfectly with the moist pavement beyond and the dark sky above, and the automobile lights filtering through the particles of mist, the coal cars would not be visible until almost upon them, and it then is everlastingly too late. It is a well-known fact that under such conditions the paved roadway ahead will present a uniform appearance looking entirely like the open roadway until within a few feet of an object when it will suddenly, for the first time, unexpectedly flash into view, and not appear until then in spite of the most intense and penetrating gaze bent to the front. The motorist knew a line of railway was there, it is true, but so far as appearances went, the street seemed to be open and unobstructed. It is not a case of failure or neglect to see that which was visible, but of inability to see what was in fact an obstructed, but appeared to be an open, roadway. And

this situation and appearance will arise under such circumstances notwithstanding the motor lights may be of the best, and shining brightly."

And again the court said: "We do not controvert for a moment the idea that if plaintiff drove his automobile in the dark onto the crossing knowing that he could not see what, if anything, was there, he would be guilty of contributory negligence as a matter of law. But the situation here is that, under the circumstances given, he drove his car into what appeared to be the open roadway at the crossing but which was in fact wrongfully and unlawfully obstructed by defendant without taking the least precaution to guard against injury caused by such silent, noiseless, and undiscernible obstruction."

So we say, if the crossing in the instant case had been shrouded in smoke or fog, and the driver of the automobile, observing this, had undertaken to drive over the crossing, he would have been guilty of contributory negligence. But no such case is before us.

In the case just quoted from it is true the cars were permitted to remain standing on the crossing for thirty minutes or more while in the instant case the gondola car had been blocking the highway for a much shorter period, but the matter of time can have no bearing on the question of contributory negligence.

Concerning authorities dealing with approaching trains or trains moving over a crossing, we think they are not applicable to the facts of this case. As stated in Elliott v. Missouri Pac. R. Co., supra: "If the cars had been moving as plaintiff approached, the movement itself might have been sufficient to disclose their obstructing presence."

There are other elements which render such cases inapposite.

We have examined the other errors assigned by defendants and find them to be without merit.

The judgment and order appealed from are affirmed.

TABER, J.: I concur.

COLEMAN, J., dissenting:

I dissent. There is no statute in this state relative to stopping of railroad trains at highway crossings.

The rule applicable to this case is correctly stated in 52 C. J., p. 189, to the effect that a railroad company is liable where it allows its train to remain on the crossing unnecessarily; or for an unreasonable length of time, by reason of which injuries are received by one who attempts, with due care, to cross.

In determining what is an unreasonable length of time for a railroad company to permit a train to block a crossing, the court must take into consideration the facts of the particular case. It might be negligence for a railroad company to block a crossing on a busy thoroughfare in a populous city at eight o'clock in the evening, for some minutes, when it would not be negligence to block a seldom used highway on the desert of Nevada at an early hour on a January morning. 22 R. C. L., p. 989. I think it is going too far to say, under the facts in this case, the defendant was guilty of negligence in permitting its train to remain on the crossing as it did.

In my opinion, the weight of the more recent authority is to the effect that one cannot recover under facts similar to those in this case. Mabray v. Union Pac. Ry. Co. (D. C.) 5 F. Supp. 397; Jones v. Texas & P. Ry. Co. (La. App.), 154 So. 768, 769; Plummer v. Gulf, etc. (La. App.), 153 So. 322.

In the last-named case it is pointed out that it is not usual to station flagmen in similar circumstances. If necessary, there would have to be two—one on each side of trains.

However, if defendant was guilty of negligence, the driver of the car in question was guilty of such contributory negligence as precludes recovery. The section where the accident took place was in a sparsely settled section of Nevada. The driver of the automobile lived in that vicinity and knew the situation. He was chargeable with knowledge of the fact that a railroad track is a place of danger. The supreme court of

California aptly quoted: "The railroad track of a steam railway must itself be regarded as a sign of danger, and one intending to cross must avail himself of every opportunity to look and listen for approaching trains. What he must do in such a case will depend upon circumstances. If the view of the track is obstructed, he should take greater pains to listen. If, taking those precautions, he would have seen or heard the approaching train, the very fact of injury will raise a presumption that he did not take the required precautions." Bilton v. So. Pac. R. Co., 148 Cal. 443, 83 P. 440, 442.

The driver of the car in question knew of the darkness of the night, the cut leading to the crossing, of the surrounding mountains, the oiled highway, and other circumstances resulting in the accident, except the presence of the train. Knowing of these facts, he was obliged to use greater care.

ON PETITION FOR REHEARING

December 12, 1935.                    52 P. (2d) 464.

For former opinion, see 56 Nev. 192, 47 P. (2d) 934.

*Leo A. McNamee, Frank McNamee, Jr., Malcolm Davis, E. E. Bennett,* and *Brown & Belford,* for Appellants.

*Chas. Lee Horsey,* for Respondent.

## OPINION

By the Court, DUCKER, C. J.:

We have carefully considered the arguments and authorities presented in appellants' petition for a rehearing, but are not persuaded that it should be granted.

It must be conceded that there are cases at variance with our opinion, but we cannot concur in the assertion that they represent the weight of authority. In the case of St. Louis-San Francisco R. Co. v. Guthrie, 216 Ala. 613, 114 So. 215, 217, 56 A. L. R. 1110, the court concedes a condition implying negligence, which, in our opinion, the circumstances of this case disclose. The court said: "In other words, the employees of the defendant, *in the absence of some peculiar environment,* are justified in believing that travelers in automobiles properly lighted and driving at reasonable speed will observe the cars upon the crossing in time to avoid coming into collision with them." (We have supplied the italics above.)

The same may be said of the case of Sisson v. Southern Ry. Co., 62 App. D. C. 356, 68 F. (2d) 403, 406, in which the court said: "Such an obligation [obligation not to use its right of way in such a manner as will likely cause injury to pedestrians or automobiles using that highway with due care for their own safety] might arise out of an unusual condition brought about by the railroad company, as, for instance, damage to the crossing by a passing train, or, again, perhaps, if the *physical conditions then existing with relation to the approach to the crossing were such that the exercise of due care on the part of the driver of an automobile would not of itself be sufficient to avoid the danger. In such a case the railroad company would be put on notice of its duty to provide other safeguards.*" (The italics are ours.)

The "peculiar environment" mentioned in the former, and the "physical conditions" stated in the latter, could

comprehend the surrounding conditions at the crossing on the morning of the accident. In St. Louis-San Francisco R. Co. v. Guthrie, supra, so much relied on by appellants and quoted from extensively in the petition for rehearing, it was held that the mere leaving of cars on a crossing, without lights or other signals to disclose their presence, was a condition which, in itself, furnished no cause of action. It is earnestly contended that such is the case here, and that the said decision represents the great weight of authority on the question involved. Let us see how the facts differ from the facts which we think constituted the peculiar environment in this case, and fully justified the trial court in concluding that the leaving of the gondola car on the crossing was an act of negligence, and the proximate cause of the death of Mrs. Lytle.

It cannot be gainsaid that black surfaces, such as oiled highways and black gondola cars, are light absorbents. These were two of the factors in the instant case contributing to the deceptive environment. In the Alabama case it does not appear that the highway, or cars across it, were dark. It does not appear that the approach to the crossing was in a cut with brown hills, or any hills, on either side of the highway, extending down a grade close to the crossing, as in the case before us. For aught that appears, the entire train may have been in view of an approaching motorist. So far as the opinion discloses, the highway may have been infrequently used, and this known to the trainmen; whereas, in the instant case, the highway was a transcontinental one used extensively by auto travelers, both day and night, and this known to the conductor. In the former case the crossing may not have been at all dangerous, while the evidence in the record here shows that the crossing was a dangerous one.

In the case cited it appears that the presence of the cars on the crossing was necessary, while the evidence in the record before us discloses that leaving the cars on the crossing was unnecessary.

We do not regard Sisson v. Southern Ry. Co., supra, as an authority in point. The facts are widely dissimilar to the facts under our consideration. The presence of the cars on the crossing there for a period of three minutes was necessary.

Nothing appears in the case to indicate that the crossing was dangerous, except a curve in the highway near it, which, of itself, was a warning to motorists to keep their cars under proper control. As the plaintiff rounded the curve, the automobile was being driven between 30 and 35 miles an hour. Plaintiff's father, who owned the car, testified that traveling at 30 to 35 miles an hour the car could be stopped in 75 or 80 feet. This was less than the distance from the crossing to the curve. The court said: "There was a bend in the road, which continued to a point approximately 85 feet from the track, measured on the inside of the curve, and considerably farther measured on the outside. This bend of the road, as plaintiff testified, while he was driving on it, deflected the headlights of his automobile from the road into the field beyond so that he could only see objects on the side of the road and not in front of the car in the direction in which he was traveling. In such circumstances as these, the railroad company had a right to anticipate that an automobilist unfamiliar with the road would slacken his speed and keep his automobile under control while his vision was obscured. The very condition on which plaintiff relies to justify his failure to see the obstruction in time to stop of itself imposed on him the duty of reducing speed and proceeding with caution. Equally the railroad company had a right to anticipate that this would be done. Obviously, if it had been done, the accident would not have occurred."

In the above case there was nothing to indicate that a man exercising ordinary vigilance could not have seen the car, or train, for that matter, on rounding the curve. In other words, it does not appear that the environment, like in the instant case, was such as to apprise the servants of the company that the obstruction was so obscured

that it would likely elude the vision of an automobilist exercising ordinary care. There is no analogy between the cases.

We are satisfied with our opinion on the question of defendants' negligence.

Now as to the alleged contributory negligence: It is stated in the brief of defendants that the majority of the court failed to give due consideration to some of the facts which are fully apparent. Just what facts having any bearing on this question which were not considered by us, the petition does not inform us, and we are aware of none. We studied the record with care and took into account all of the evidence which, in our opinion, had any probative force. From such consideration we reached the conclusion, which has not been changed by further thought and study, that it cannot be said as a matter of law that the driver was guilty of contributory negligence. We did not lose sight of the fact that it was testified to that the driver, shortly after the crash, was heard to say that he must have been asleep. The district court doubtless rejected that statement, and with reason. The injured man was desperately hurt; he was practically unconscious from the time of the crash until he was removed from the scene and taken to the hospital, or at least reduced to such a state, by suffering induced by pain and shock, that his mind was clouded. This condition was attested by witnesses. Statements made under such circumstances are of no value as evidence. Concerning a confession of carelessness by an injured person during the period of shock, this court said in Jones v. West End Consol. Min. Co., 36 Nev. 149, 154, 134 P. 104, 106: "That he said something to this effect is undisputed even by himself; he simply says that he has no recollection of it or any distinct recollection of anything else during a certain period just after his fall. That his remark was within the period of shock is admitted. * * * It meant nothing. It was the irrational talk of a man in a semiconscious condition, in agony, depending for help upon those about him."

So here, the injured man testified: "The first thing I remember after the accident was in one of the rooms of the hospital—they were working on me." He testified positively that he did not go to sleep, and there is no evidence in the record indicating that his faculties were not alert.

Defendants concede that leaving the gondola car on the crossing formed an unusual condition. In this regard it is said in the petition for a rehearing: "True, the road was oiled and the railroad had placed a car entirely across the highway, which, because of the surroundings, blended into the landscape." We have previously pointed out the other circumstances under which that act became an act of negligence and the proximate cause of the death of Mrs. Lytle. On the morning of the accident, in the light of all the circumstances, it would not occur to a reasonably prudent person, situated as the driver of the automobile was, that defendants would be likely to place a motionless, invisible obstruction across the highway, especially when such act was unnecessary to properly accomplish the switching of cars. To this extent at least, there was assurance in the thought that the crossing was clear. Due to the act of defendants it was seemingly clear, but really obstructed. This condition was not revealed to the driver until he was within about 20 feet of the crossing, when, as the evidence discloses, it was too late to avoid the fatal shock. It is insisted that if the driver had been proceeding with due caution he would have seen that the highway was blocked in time to stop. Other than what might be inferred from the fact that he was traveling at a speed of 25 to 30 miles an hour, there is no evidence tending to show that he was not observing due caution, or that he ought to have seen the obstruction before he did. The evidence shows that he was an experienced driver; that he was familiar with the crossing and the approach to it, having traveled over that part of the highway a number of times. He knew that the highway was straight from a distance

of about 1,200 feet from a point where he was approaching the crossing, to it. He knew, both from his own knowledge of the place and the signs at the side of the road when he was drawing near to the railroad and slowed down to 25 or 30 miles an hour. While he was driving down towards the crossing, he was looking straight ahead watching the road, and he knew that the lights of his automobile were sufficient to disclose an object 75 feet ahead of the lamps under normal conditions. But the evidence shows, as we have heretofore stated, that conditions were not normal. There is no testimony other than the driver's in the record as to his conduct immediately before the crash or when and after he entered the straight-of-way towards the crossing, or as to his inability to see the obstruction sooner than he did.

Defendants assert that the witness Lamond Laub, who, with his two brothers, arrived at the scene in an automobile from the direction in which the driver was traveling, immediately after the crash, testified that he could see the gondola car from a point about 150 feet away. We find no such unqualified testimony in the record. What he testified to was:

"Q. Well, didn't they tell you there was a train there? A. They said there was an awful wreck.

"Q. About how far? A. About 50 yards I should say.

"Q. And you could see the train from where you were, 50 yards back? A. After my attention was drawn to it.

"Q. And you could see it with the lights of your automobile? A. Yes."

He had previously testified as follows:

"Q. When you got to the straight road headed towards the crossing, you saw some lights down there, did you not? A. Yes, sir, seen the train crew.

"Q. And one of the lights at least was flagging you down? A. Yes, sir; there was one ahead of the other and the one flagged us down."

Under such circumstances, after his attention had been called to it, he could see the obstruction, but that

is no testimony at all tending to show that he could have seen it sooner than the driver did had he been situated as the former was. The driver would probably have seen the car sooner if there had been a train crew with lights to warn him of its presence.

On the evidence in this case bearing on the question of the driver's contributory negligence, we do not believe that rational and impartial minds would be impelled to reach a common conclusion of negligence. The question was, therefore, legally resolved against defendants' contention by the lower court.

Petition for rehearing should be denied.

It is so ordered.

TABER, J.: I concur.

COLEMAN, J.: I dissent.