[Civ. No. 5674. Third Appellate District.—April 23, 1937.]

NORA MALLETT, Respondent, v. SOUTHERN PACIFIC COMPANY (a Corporation), Appellant.

502

George R. Freeman and R. C. Colombe for Appellant.

Carter & Barrett, Clair Engle and Daniel S. Carlton for Respondent.

THOMPSON, J.—On rehearing of this cause we are satisfied the original opinion correctly determined the issues on appeal. With certain modifications we have therefore adopted it as the opinion of this court.

The Southern Pacific Company appealed from a judgment of $8,259.25, which was rendered against it in a railroad crossing casualty which occurred in the town of Corning. The plaintiff was returning in the nighttime to her home from a restaurant which she conducted on the opposite side of the track. The crossing was unlighted and dark. Four parallel railroad tracks occupying a space of about eighty feet in width extend north and south through the town of Corning. A short distance south of the depot, Solano Street crosses the railroad tracks at a right angle. The street is sixty feet in width and is paved. The railroad bed is elevated slightly above the level of the street. From a point 120 feet west of the railroad right of way, Solano Street ascends to the level of the tracks at a grade of from $1\frac{1}{4}$ per cent to 2.91 per cent, the steepest portion being adjacent to the nearest rail. The railroad bed is approximately level. Approaching from the west, the first track to be reached is a side track called the house track. Twenty feet easterly from that side track is the main track. Beyond the main track there are two other tracks. These tracks extend parallel through the town. An automatic wig-wag system was maintained at the Solano Street crossing. The device is located easterly of the main track and about six feet southerly of the south line of Solano Street. It consists of a red electric lamp which con-

tinues to swing and an alarm bell which continues to ring while a railway train occupies the track within the zone in which it operates. This automatic wig-wag system does not operate the same with respect to both north and south bound trains. It is so arranged that when a train which is traveling south reaches a point 1700 feet north of the crossing, the red light begins to swing and the bell begins to ring. They continue to operate until the last car has passed a point 17 feet south of the Solano Street crossing. But when a northbound train reaches a point 1350 feet south of that crossing the wig-wag begins to operate, but the lamp ceases to swing, and the bell ceases to ring when the last car passes a point 31 feet south of the Solano Street crossing. The plaintiff was not aware of that difference in the operation of the wig-wag system with respect to north and south bound trains. She was familiar with that crossing, having passed over the tracks at that point almost daily for more than two years. She believed the wig-wag system operated uniformly so that the lamp would continue to swing and the bell would continue to ring until the last car of either a north or south bound train passed the Solano Street crossing. The defendant's yard foreman testified that the wig-wag was supposed to continue to operate until the train passed beyond the crossing. The plaintiff was deceived by that lack of uniform operation of the wig-wag system.

March 17, 1934, at 4 o'clock in the morning, the plaintiff left her home east of the railway station and drove in her Ford coupe to her restaurant west of the railroad tracks in the town of Corning, to begin preparations for breakfast. Having placed a roast in the oven and having completed preparations for breakfast, she started to return to her home to procure her daughter to assist her in the restaurant. It was a dark night. The railroad crossing was not lighted. The nearest electric light was located at the hotel corner on Solano Street 160 feet from the crossing. The plaintiff was alone in her automobile. It was in good mechanical condition. The headlights were burning. About the time she started to return to her home, a freight train arrived on the main track from the south. It consisted of an engine and tender, three box cars, a low gravel gondola car and a caboose. The train stopped at the station so that the gondola car completely blocked the Solano Street crossing. The caboose stood immediately south of the crossing, but it had passed

the point at which the wig-wag ceased to operate. The red lamp was not swinging and the bell had ceased to ring. There were lights in the caboose and a green light was attached to the side near its rear end, but these lights were evidently hidden from view, for the plaintiff testified that she stopped, looked and listened just before she reached the nearest track and that she saw no train or lights and she heard no bell or the sound of a moving train. She said there were stationary box cars on the westerly side track both north and south of the crossing. It is reasonable to assume the box cars south of the crossing may have obscured her view of the caboose and of the lights which it displayed. These box cars on the house track on either side of the crossing may also have helped to render it more difficult for the plaintiff to see the low, dark gondola car which blocked the crossing on the main track. The gondola car stood only seven and a half feet in height. The sides extended downward to a point within about three feet of the track. Beneath its box the bed extends downward in a V-shape to within 14 inches of the ground. This extension is called a dump. An iron lattice extends from the bottom of the gondola box on either side to within 14 inches of the ground.

As the plaintiff approached the track she observed the box cars on the nearest track on either side of the crossing, but she failed to see the gondola car which blocked the crossing on the main track. She was not expecting a train to arrive at that time in the morning. She neither heard nor saw the train on the main track. She stopped her automobile just as she reached the first track, about twenty feet from the main track. She looked for the red wig-wag light but did not see it. She listened for the electric bell and heard none. It is conceded the lamp was not then swinging and the bell had ceased to ring. She then threw in the clutch of her machine and proceeded on her way over the crossing, when suddenly she saw the gleam of the wheels of the gondola car as her lights shone upon them. She immediately threw out the clutch and applied the brakes, but was unable to stop her machine in time to avoid a collision. She swerved to the left, but struck the gondola car with great force, wedging her automobile beneath it. She received serious personal injuries as a result of the accident, and was taken in a senseless condition into the railway station, where a physician soon arrived to attend her. This suit for damages was subsequently in-

stituted. The cause was tried with a jury. A verdict was returned in her favor. Judgment was rendered accordingly. From that judgment the defendant has appealed.

The appellant contends that the evidence fails to support the implied findings of the jury and judgment to the effect that it was guilty of negligence in blocking the railroad crossing; and asserts that the evidence affirmatively shows the plaintiff was guilty of contributory negligence, and that the court erred in refusing to grant the defendant another trial on the ground of newly-discovered evidence to the effect that plaintiff was intoxicated at the time of the accident.

 Under the circumstances of this case the question regarding the alleged contributory negligence of the plaintiff was a problem for the determination of the jury, with which we may not interfere on this appeal. It was a dark night. The crossing was unlighted. She had neither seen nor heard the arrival of the train. She did not expect a train at that time of the night. The wig-wag system had ceased to operate before she arrived at the crossing. The train was stationary, with the gondola car blocking the crossing. She was given no warning of its presence either by means of lights or otherwise. Box cars stood on the house track on either side of the crossing as she approached, concealing her view of the lighted caboose which stood south of the crossing on the main track. These box cars on the side track, between which it was necessary for her to pass before reaching the main track, undoubtedly increased the density of the shadows and rendered it more difficult for her to see the low, dark gondola car which blocked the crossing on the main track. She stopped her machine at the side track, twenty feet or more from the main track, where she looked and listened for a train and for the wig-wag bell. She failed to see the gondola car, and she heard no bell. Assuming that the crossing was clear, she threw in the clutch of her automobile and proceeded to cross the tracks. In spite of the theory that the rays of light from the standard headlights of an automobile which are required by the provisions of the Vehicle Code of California, within specified limited distances are presumed to disclose to view an object, it is common knowledge that a black stationary object against the dark background of a highway is difficult to see on a dark night, even with the aid of standard headlights. Obviously, the color of an object on the highway on a dark night, and the presence of other ob-

jects which may deepen the shadows in that vicinity, must be considered in determining how clearly it may be seen by means of standard automobile headlights. For the reason that standard headlights of an automobile do not clearly illuminate the dark surface of a highway, the motor vehicle department paints a white stripe in the center thereof. In the case of *Los Angeles & Salt Lake R. Co.* v. *Lytle*, 56 Nev. 192 [47 Pac. (2d) 934, 52 Pac. (2d) 464], which involved a collision in the nighttime between an automobile and a stationary gondola car under circumstances somewhat similar to this case, the court said:

"The extent to which a black surface will absorb the light of an automobile is known to every motorist."

The plaintiff in this case failed to see the gondola car. She relied on the ringing of the wig-wag bell to warn her of the presence of a train, and assumed that the silence of the bell was an invitation for her to cross the tracks. She was led to believe they were then unobstructed. Her machine was well under way, and she was close to the gondola car before she observed the flash of her lights on the steel of the gondola wheels. She immediately applied her brakes and swerved sharply to her left, but was unable to avoid the collision. There is evidence of reasonable prudence on her part in attempting to cross the tracks, and there is no evidence of carelessness except the fact that she failed to see the gondola car which blocked the crossing. Her failure to observe this low, dark car against a black background at an unlighted crossing may be reasonably accounted for. Ordinarily, the question of contributory negligence is a problem for the determination of a jury. Under the circumstances of this case we are of the opinion this court may not interfere with the implied finding of the jury that the plaintiff was not guilty of contributory negligence, even though we may concede that reasonable minds might differ regarding that question.

We are also of the opinion the evidence adequately supports the implied finding of the jury that the defendant was guilty of negligence which proximately caused the injuries sustained by the plaintiff, by maintaining at the Corning railroad crossing a defective electric wig-wag system which did not operate uniformly with regard to both north and south bound trains, and which variance and silence of the wig-

wag bell deceived the plaintiff and led her to believe the crossing was unobstructed.

■ The plaintiff lived near the railway station and was familiar with the Solano Street crossing. She had crossed the tracks at that street almost daily for more than two years. She had frequently observed the operation of the wig-wag system, and believed that it continued to operate until the Solano Street crossing had been passed by the last car of either a north or a south bound train. She did not know that the electric system was installed so that the wig-wag ceased to operate when the last car of a northbound train passed a point 31 feet southerly of the Solano Street crossing. She did not know that it was possible for the wig-wag system to cease operating while a northbound train actually blocked the crossing. The railroad company was aware of that fact. It was evidently deliberately installed in that defective manner, and therefore became a trap which lured the plaintiff to attempt to cross the tracks because of the silence of the wig-wag bell.

There appears to be no good reason for maintaining a system by means of which a wig-wag light and bell continue to operate until a southbound train has passed the station and the Solano Street crossing, and yet which fails to operate for a northbound train while that crossing is still blocked by the train. It appears that lack of uniformity in the operation of the wig-wag system is exactly what lured the plaintiff into danger, and we are of the opinion that defect in the electric wig-wag system constitutes actionable negligence under the circumstances of this case.

The appellant asserts that the alleged defect in the wig-wag system does not constitute negligence, for the reason that a railroad crossing is itself a warning of the presence of stationary cars and that the wig-wag system is merely intended to give warning to travelers on the highway *of the approach of trains*. In support of these contentions the appellant cites the case of *Dunlap* v. *Pacific Elec. Ry. Co.*, 12 Cal. App. (2d) 473 [55 Pac. (2d) 894].

■ It is true that a railroad track is itself ordinarily a warning of danger at the crossing from either moving or stationary cars. Common knowledge of the movements of trains will usually charge travelers on the highway with the information that they are likely to encounter railway trains in attempting to cross the tracks. (*Koster* v. *Southern Pac.*

*Co.*, 207 Cal. 753 [279 Pac. 788].) A railroad company will not ordinarily be held liable for negligence merely because a crossing is temporarily blockaded by cars in the nighttime or in a dense fog, without furnishing lights or a watchman to warn travelers on the highway of the danger, provided such conduct is not in conflict with an ordinance or a statute to the contrary. (*Dunlap* v. *Pacific Elec. Ry. Co., supra*; *Baldwin* v. *Pacific Elec. Ry. Co.*, 208 Cal. 364 [281 Pac. 380].) The Dunlap case, upon which the appellant relies, cites with approval the case of *Mabray* v. *Union Pac. R. Co.*, 5 Fed. Supp. 397, and states:

"It was held that a railroad company has a right to occupy a crossing in the conduct and operation of its business, and that such obstruction is in itself notice of danger, so that the railroad company is not bound to give any further warning; and that after a train has reached a crossing the duty of a flagman ends as to that train, since the train itself is a sufficient warning."

It is further said in the Dunlap case:

"No question of the giving of a warning of the approaching train is here involved, because at the time of the accident the engine has passed the crossing and was several hundred feet north thereof. 'All crossing signals are intended to protect the traveler against *approaching trains,* and have been so regarded by our courts.' "

The preceding language was used in the Dunlap case in affirming a judgment which was rendered against the plaintiff. However, it does not appear in that case that the appellant ran her automobile into a stationary train which was blockading a railroad crossing, relying upon the ringing of an automatic bell to warn her of an obstructed condition of the crossing, or that she was deceived by the silence of the bell into believing that the crossing was unobstructed. It does appear in the Dunlap case that there was an automatic wig-wag signal which was maintained at the crossing, and that "at no time did he (the driver) see any lights or see any wig-wag working". But it neither appears in that case that the driver was deceived by the failure of the automatic device to operate in a uniform manner, nor that he relied upon that signal as a warning. The Dunlap case should be distinguished from the present case in that regard.

Likewise it was said in the Lytle case, *supra,* regarding the rule which ordinarily exempts a railroad company from

liability for negligence resulting from the blocking of a crossing without furnishing lights or a watchman to warn travelers on the highway of the danger of stationary cars:

"A railroad company, in the absence of a statute requiring lights or other precautions, may not be chargeable with actionable negligence merely because its train is at rest on a crossing at a public highway, or in motion, and is run into by an auto traveling on the highway. Certainly it cannot be so chargeable if the accident happens in the daytime, nor in the nighttime *on account of darkness alone.*"

However in sustaining the judgment in the last-mentioned case for injuries sustained by the plaintiff in colliding with a stationary gondola car which blocked a highway crossing in the nighttime in a dark place, the court further said:

"In the daytime the car itself would have been sufficient warning to travelers on the highway that the crossing was blocked, but under the existing condition the placing of it on the crossing and leaving it without taking adequate precautions to warn approaching motorists of the danger, amounted to negligence.

. . . . . . . . . . . . .

"The average automobilist, when he encounters fog or smoke obscuring his way, instinctively acts with caution. Whereas an obstruction in his road under such conditions that the lights of his car cannot reveal it may become a trap despite his vigilance. The extent to which a black surface will absorb the light of an automobile is known to every motorist."

The language of the last paragraph is applicable to the present case. Moreover the plaintiff in this case was lured into attempting to cross the railroad tracks because of the silence of the wig-wag bell.

Whatever may be the purpose of maintaining an automatic wig-wag signal at a railroad crossing, even though it be intended to merely warn travelers of the *approach* of trains, common justice demands that it shall be so constructed and maintained that it will not lure travelers on the highway into danger. It follows that a company which does maintain such a defective system will be held liable for injuries sustained as the result of those imperfections, regardless of whether the system was designed to warn travelers of the approach of trains rather than to inform them of the danger from stationary cars which block the crossings. █ It is

true that ordinarily the presence of a train which is stationary across a public highway is a sufficient warning of danger to a traveler who sees it, or who by the exercise of ordinary care will be presumed to have seen it. But if, through no fault of the traveler, the train is not observed, and he is injured by relying upon and reasonably acting in compliance with the signals of a system known by the company to be defective, the company will be liable therefor. When railroad crossing signals are maintained by a company, even though the law does not require them to be installed, the public has a right to rely upon the exercise of reasonable care on the part of the railroad company, to keep them in good repair and in efficient working condition. (*Wyseur* v. *Davis,* 58 Cal. App. 598 [209 Pac. 213] ; 52 C. J. 201, sec. 1791.)

In the authority last cited it is said:

"If signals are provided, although not required by statute, the public has the right to rely thereon, and the company must use reasonable care to keep them in good condition and in working order, or to give notice that they are not operating, *since if such a signal is misunderstood it is a menace.*"

This case, which is dependent upon the plaintiff's reliance upon what may be deemed to be a defective automatic signal system, should be distinguished from those cases upon which the appellant relies in which the complainants were injured through their own contributory negligence by colliding with railroad cars which blocked a crossing, merely because the companies were not required to furnish special lights or watchmen to warn travelers of the danger at the crossings. In the case of *Louisville & N. R. Co.* v. *Mahoney,* 220 Ky. 30 [294 S. W. 777], it is said in that regard:

"Possibly the light in the wig-wag signal was not intended to give light to a traveler upon the highway so that he could see a train upon the track, but it was intended to give a warning signal to travelers upon the highway that the crossing was then occupied by a train or was about to be occupied by a train then approaching, and to warn the approaching traveler of the danger of attempting to pass over the crossing, and a traveler upon the highway, who was acquainted with the fact that a wig-wag signal bell and light was regularly maintained at that crossing, had a right to rely upon the efficiency of that signal to warn him of the approach of the train to the crossing *and of the train upon the crossing,*

when he could not see and know of the train at or about the crossing.''

The appellant cites the case of *Atchison, Topeka & Santa Fe Ry. Co.* v. *Scarlett,* 300 U. S. 471 [57 Sup. Ct. 541, 81 L. Ed. 748], in support of its contention that the wig-wag system which was installed at the crossing in Corning was in accordance with the approved rules of the Railroad Commission and therefore exempts the railroad company from negligence on account of any defect in the system which may exist. We are of the opinion the Scarlett case is not in point for the reasons that it involves a railroad accident coming within the interstate commerce rules including the doctrine of ''assumption of risk'' on the part of the injured employee because of his knowledge of the fact that the device through which his injuries were received had been used in that condition for a long period of time (*Myers* v. *Southern Pac. Co.,* 14 Cal. App. (2d) 287, 294 [58 Pac. (2d) 387] ), and that he continued in his employment notwithstanding that fact. Scarlett was a brakeman. While he was descending from a box car by means of a ladder attached to its side, his foot slipped on a round brace rod which extended diagonally across the face of the car and under the ladder. He fell to the ground and was injured. The court said:

''The ladder itself was not defective. In its structure it complied with the regulations of the Interstate Commerce Commission made in pursuance of the act. 'United States Safety-Appliance Standards'—order of March 13, 1911. It is unnecessary to set forth these regulations. The only one important here prescribes—'Minimum clearance of treads, (shall be) two (2) preferably two-and-one-half (2½) inches'. The round brace rods with which the car was equipped extended outward from the wall of the car a distance of more than an inch. These brace rods operated to strengthen the walls of the car. That was their only purpose; and there is no doubt as to their necessity for that purpose. The brace rod in question ran down the side of the car at an angle of about 45 degrees. The ladder overlay the brace rod, and cleared its outermost surface by more than the prescribed 2½ inches. . . . In the light of the long continued use of brace rods of the type here in question in the same relation to the ladder as in the case here, we may fairly presume that the Interstate Commerce Commission in the performance of its duties was aware of the situation, and knowingly per-

mitted its rule in respect of the ladder clearance to remain without change. . . .

"The regulation having been made by the commission in pursuance of constitutional statutory authority, it has the same force as though prescribed in terms by the statute. And the railway company having strictly complied with the regulation has discharged its full duty so far as the ladder requirement of the Safety Appliance Act is concerned."

On the doctrine of "assumption of risk", Scarlett saw and knew of the cross rod underlying the ladder, or in the exercise of ordinary prudence should have seen it and realized the danger which it created. In the present case the plaintiff did not know of the defect in the wig-wag system which caused the red light to cease swinging and the bell to stop ringing when a northbound train had not passed the crossing. On the contrary she believed that they continued to operate alike with both north and south bound trains until the crossing was cleared.

Moreover, if the Railroad Commission of California has approved the arrangement of the particular wig-wag system which was installed at Corning, or any similar system, with the defect upon which the plaintiff relies as ground of negligence, no such rule was offered in evidence. All that appears in this record regarding the alleged approval of this wig-wag system by the Railroad Commission is the statement made by Clarence Walker, the appellant's signalman, who, in response to the question, "But there isn't any reason why you couldn't have a signal that rings when the crossing is blocked going either way?" replied, "I don't know. Those plans are approved by the Railroad Commission before the bells are installed. That is engineering." We are of the opinion the preceding statement is not adequate proof that the Railroad Commission adopted rules or approved the wig-wag system which was installed at Corning. We assume that the Railroad Commission, being a *quasi*-judicial tribunal, has the delegated authority to adopt and enforce *reasonable* rules and regulations. But it does not follow that it may adopt unreasonable rules which may authorize the maintenance of a trap to lure employees or individuals into danger. We assume it has not done so. The evidence does not show that it approved the system as it exists at Corning or any similar system elsewhere. Under the circumstances of this case, the question of the appellant's negligence in maintaining what

may be deemed to be a defective system was a problem for the determination of the jury.

The defect in the wig-wag system, upon which the respondent relies, is adequately alleged in the complaint, in the following language:

"The defendant, Southern Pacific Company, a corporation, wilfully, wantonly, carelessly and negligently *maintained and operated said electric wig-wag signal in a defective condition;* . . . that said plaintiff believed that said electric wig-wag signal was in proper working order and would swing to and fro, and that the said electric bell would ring loudly in case a train, cars or locomotives *were obstructing said intersection.*"

The court did not err in denying defendant's motion for a new trial on the ground of newly-discovered evidence. The evidence contained in the affidavits which were presented on that motion with relation to the plaintiff's alleged intoxication is conflicting. The granting of a new trial rests largely in the discretion of the trial judge and his determination of that motion will not be disturbed on appeal except for a clear abuse of discretion. When there is a substantial conflict of evidence in the affidavits which are presented regarding the issue which is involved in the motion for a new trial, the ruling of the trial court will not be disturbed on appeal. (*Kataoka* v. *Hanselman,* 150 Cal. 673 [89 Pac. 1082] ; *Wessel* v. *Cazaretto,* 109 Cal. App. 390 [293 Pac. 111] ; *Miles* v. *Miles,* 77 Cal. App. 219 [246 Pac. 143] ; 20 Cal. Jur. 81, sec. 58.)

There is an abundance of evidence upon which the court was warranted in determining that the plaintiff was not intoxicated at the time of the accident. It appears she left her restaurant about ten o'clock the night of the accident. She accompanied a friend by the name of Mrs. Hiam to Camp Olive, where they drank one or two glasses of beer. She then drove home and went to bed where she remained until about three or half-past three o'clock in the morning when she arose and started to drive to her place of business. These circumstances are corroborated by other affiants. But more important upon that issue of intoxication is the fact that the plaintiff was taken in an unconscious condition directly from her machine into the defendant's depot, where she was surrounded by some of defendant's employees, none of whom suggested that they detected the presence of the fumes of

liquor or any indication that she was intoxicated. Moreover, Doctor Arthur H. Neuser, a reputable Corning physician, who attended her immediately after the accident occurred, averred that:

"Affiant particularly examined said plaintiff to determine whether or not she was intoxicated or was under the influence of intoxicating liquor, or had recently drunk intoxicating liquor; that affiant smelled plaintiff's breath at said time, talked with her, and observed her for the purpose of determining whether or not there was any evidence whatever of intoxication, . . . and affiant did not detect any odor of alcoholic liquor on plaintiff's breath, and saw no other evidence whatever that plaintiff was intoxicated or was under the influence of intoxicating liquor, or had recently drunk intoxicating liquor, and affiant is of the opinion . . . that plaintiff was not then intoxicated or under the influence of intoxicating liquor, or had recently drunk intoxicating liquor."

The judgment and the order are affirmed.

Plummer, J., and Pullen, P. J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on June 21, 1937.